BOARD OF ASSESSORS OF SANDWICH *vs.* COMMISSIONER OF
REVENUE.

Suffolk. October 5, 1984. — December 20, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Commissioner of Revenue. Appellate Tax Board,* Determination of value.
*Taxation,* State owned lands, Value.

On appeal pursuant to G. L. c. 58, § 14, from a determination of value of
State owned lands made by the Commissioner of Revenue under G. L.
c. 58, § 13, the Appellate Tax Board can make an independent determi-
nation of value only if it finds that the Commissioner failed to comply
with § 13, and then only in accordance with § 13. [585-586]
In a proceeding before the Appellate Tax Board challenging the valuation
of certain State owned lands by the Commissioner of Revenue, the board
erred in concluding that the Commissioner's method of valuation failed
to comply with the requirements of G. L. c. 58, § 13, based on the Com-
missioner's reliance on documentary evidence without a personal inspec-
tion of the property in question and on the board's preference of a method
of valuation used by an expert witness. [586-588]
Where it appeared in a proceeding before the Appellate Tax Board challeng-
ing the valuation of certain State owned lands by the Commissioner of
Revenue that the Commissioner's method of valuation satisfied the re-
quirements of G. L. c. 58, § 13, but that the Commissioner may not
have considered certain evidence, contrary to the procedure described
by the Commissioner's expert, and that the Commissioner's figures as
to the size of several parcels being valued were inaccurate, the board
was to correct the valuation in accordance with the method used by the
Commissioner. [588-589]
In valuing certain parcels of State owned lands under G. L. c. 58, § 13, the
Commissioner of Revenue properly excluded the effect of internal roads
on the value of the parcels, on the ground that the roads were "improve-
ments" and, as such, excluded from a determination of value under § 13.
[589-590].

APPEAL from a decision of the Appellate Tax Board.
*H. Reed Witherby,* Assistant Attorney General, for the Com-
missioner of Revenue.

*Alan A. Green,* Town Counsel (*Mark D. Carchidi* with him) for the plaintiff.

O'CONNOR, J. This is an appeal by the Commissioner of Revenue (Commissioner) from a decision of the Appellate Tax Board (board) holding that the Commissioner failed to comply with G. L. c. 58, § 13, in valuing State owned lands in the town of Sandwich. The board of assessors of Sandwich (assessors) had appealed to the board from the Commissioner's determination that the value of State owned lands located in Sandwich as of January 1, 1980, was $12,433,000. The board found that the value of the lands was $29,208,000. We reverse the board's decision modifying the Commissioner's determination of valuation, and remand the case for further proceedings consistent with this opinion.

General Laws c. 58, § 13, as amended through St. 1978, c. 514, §§ 43, 44, provides that in 1975, and every fifth year thereafter, "the commissioner shall, on or before June first, determine as of January first the fair cash value as hereinafter provided of all land in every town owned by the commonwealth and used for [specified] purposes. . . . As used in this section, 'land' shall not include buildings, structures, improvements or other things erected thereon or affixed thereto." The values determined by the Commissioner under this section are used to calculate the amount of reimbursement in lieu of taxes each municipality receives annually from the Commonwealth under G. L. c. 58, § 17. We are informed by the Commissioner that, since 1980, the Legislature has not appropriated sufficient funds to reimburse municipalities at the rate required by the statute. See G. L. c. 63, § 58. Instead, the appropriation has been prorated among the municipalities with State owned lands, and the amount of each municipality's reimbursement depends upon the proportionate value of its State owned lands.

In 1980, pursuant to the statute, the Commissioner undertook a valuation of all State owned lands in the Commonwealth. In the spring of that year, the Commissioner notified the assessors that the State owned lands in Sandwich had been valued under § 13 at $12,433,000. The assessors filed an "application for a correction" with the board under G. L. c. 58, § 14, as

amended by St. 1978, c. 514, § 45, which provides in part: "[T]he board shall, upon the basis of such application, or after giving [the] assessors a hearing, as the board may determine, make a finding whether the commissioner acted in accordance with section thirteen. If the board finds that the commissioner failed so to act, it shall thereupon make a determination of value in accordance with section thirteen . . . and its decision shall be conclusive." The assessors failed to file their application for a correction within the statutory period allowing for such an appeal,[1] however, and the board dismissed the appeal for lack of jurisdiction. This court affirmed that decision. *Assessors of Sandwich* v., *Commissioner of Revenue,* 382 Mass. 689 (1981).

Subsequently, the Legislature enacted St. 1981, c. 351, § 131, which provides: "Notwithstanding the provisions of [G. L. c. 58, § 14] relative to the time for appeal from determination made pursuant to [c. 58, § 13], the town of Washington and the town of Sandwich shall have ninety days from the effective date of this act [July 1, 1981] to file such an appeal and proceed in accordance with said section fourteen as if such period had not expired." During this renewed appeal period, the assessors again filed an appeal with the board.[2]

---

[1] In 1980, the statutory period for appeal to the board was ten days. Statute 1981, c. 506, amended G. L. c. 58, § 14, to extend the filing period to thirty days.

[2] The Commissioner moved for dismissal of the second appeal on the ground that St. 1981, c. 351, § 131, violates arts. 10 and 30 of the Declaration of Rights of the Massachusetts Constitution, and therefore was ineffective to confer jurisdiction on the board. The Commissioner also argued that the statute was invalid because it was enacted as an "outside section" of an appropriations bill. Cf. *Attorney Gen.* v. *Administrative Justice of the Boston Mun. Court Dep't,* 384 Mass. 511, 517-518 (1981). The board denied the Commissioner's motion, concluding that the statute was constitutional.

On appeal to this court, the Attorney General, in the brief filed on behalf of the Commissioner, expressly declined to renew this challenge to the board's jurisdiction, stating that "an argument by an officer of the Commonwealth that a statute is unconstitutional or beyond the authority of the Legislature is appropriate, if at all, only in extreme or unusual circumstances," and citing *Spence* v. *Boston Edison Co.,* 390 Mass. 604 (1983). We therefore express no opinion as to the constitutionality of the statute.

At the hearing before the board, each party presented an expert witness who testified as to the methods used in valuing State owned lands in Sandwich. We summarize the testimony. The Commissioner's expert described in general terms the procedures used to value lands Statewide. The Commissioner used a market data approach to valuation, which involved analyzing sales of comparable lots to determine a base value for land in the town. Most of the information on comparable sales was obtained from forms that local boards of assessors are required to file with the Commissioner for equalized valuation purposes (3-S reports). See G. L. c. 58, §§ 10, 13. The base land value was then adjusted for each site to account for topography and soil conditions at the site, the neighborhood surrounding the site, the zoning or development restrictions in the community, and the availability of public utilities. This information was obtained through site inspections by field appraisers, from government survey maps, and from the local communities themselves. The Commissioner did not consider the effect of internal roads on any of the sites, on the ground that such roads are "improvements," and not to be considered in the valuation process.

In Sandwich, the Commissioner grouped State owned lands into eight parcels, the most significant of which was the military reservation (Otis Air Force Base and Camp Edwards). Other parcels included State forest land, a fish hatchery, and a game farm. With the exception of the military reservation, the Commissioner used comparable sales data taken from the town's 3-S reports for 1978 and 1979. Based on these sales, the land was valued at $4,200 per acre for tracts of less than forty acres, and $3,300 per acre for tracts of more than forty acres. A different approach was used for parcels of land which were too large to permit valuation based on comparable sales. Those parcels were valued by distinguishing between lots fronting on external roads and back land. Based on the 3-S reports, lots fronting on external roads were valued at $15,000 per acre, and back land was valued separately for each site depending on its shape and topography. Still another approach was used

in regard to the 8,600[3] acre military reservation. The Commissioner determined that, because of the size of the parcel, there were no comparable sales from which a value for the back land could be calculated. Therefore, the lots fronting on external roads were valued at $15,000 per acre, while the back land was valued using the town's own assessed value for the land. The Commissioner justified using the assessed value on the ground that all the land in the town is assessed at 100% of fair cash value. The Commissioner concluded that the fair cash value of State owned lands in Sandwich as of January 1, 1980, was $12,433,160.

The expert witness for the assessors had conducted an independent valuation of State owned lands in the town. Like the Commissioner, he employed a market data approach to valuation, using twenty comparable sales to determine land value. He personally reviewed and examined each parcel of State owned land, and the details of each parcel considered as a comparable sale. His report included aerial photographs of the appraised property, maps, deeds, and other photographs. The assessors' expert apparently considered the existence of frontage on internal roads in determining the value of the land. He concluded that the fair cash value of State owned lands in Sandwich was $36,500,000, approximately treble the value assigned by the Commissioner.

After hearing the testimony of both witnesses, and after taking a view of the State owned lands in Sandwich, the board issued its decision and findings of fact. The board found that the Commissioner had failed to act in accordance with § 13. It based that conclusion on the following findings of fact: the assessors' expert had personally viewed each parcel, while the Commissioner's expert had not viewed any of the land and had relied on information furnished by others; the Commissioner's method of assigning a higher value to land fronting on external roads than to back land did not value the land at

---

[3] Although the Commissioner's final estimate of value listed the military reservation as 8,125 acres, the parties eventually stipulated before the board that the military reservation contained 8,600 acres.

fair cash value according to its highest and best use; the Commissioner's expert had admitted that the assessors' appraisal report stated the correct size of each parcel; the Commissioner's figures for the size of some of the parcels were incorrect; the Commissioner had failed to follow the procedure he had established for valuing land Statewide; and the Commissioner relied on 3-S reports rather than personal inspection of parcels considered as comparable sales. The board also apparently misconstrued a statement in the Commissioner's posttrial brief which discussed the lack of sufficient appropriations to reimburse towns fully. The board treated the statement as an admission that the Commissioner did not value the land at fair cash value as required by the statute. The board concluded that the fair cash value of the State owned lands was $29,208,000.

On appeal, the Commissioner argues that the board's conclusions were based on an erroneous interpretation of the legal standards established by G. L. c. 58, § 13. He also argues that the board's findings of fact were not supported by the evidence. The assessors argue that the board's findings of fact and determination of value are conclusive, and that this court's review should be limited to determining whether the board's findings were supported by substantial evidence. The crucial issue in determining the amount of deference we give the board's conclusions is whether the board properly construed its role under G. L. c. 58, § 14, and the scope of its review of the Commissioner's determination of value.

The Appellate Tax Board is established and defined in G. L. c. 58A. Section 6 sets forth the board's jurisdiction to decide appeals. Sections 7 through 10 set forth the procedures for filing petitions, service of process, obtaining discovery and conducting hearings. Section 11 authorizes the board to administer oaths, to summon and examine witnesses, and to require the production of evidence. It also allows parties to summon witnesses or to compel the production of papers "in the same manner . . . [as] for the purpose of trials in the courts." G. L. c. 58A, § 11. Section 13, as amended through St. 1983, c. 72, § 2, authorizes the board to make written findings of fact and provides that the "decision of the board shall be final as to findings of fact."

These provisions indicate that ordinarily an "appeal" to the Appellate Tax Board results in a trial of all the issues raised by the petition and the answer. The board hears testimony from all parties and forms an independent judgment of value based on all the evidence received. In reaching its conclusion, the board may select any method of valuation that is reasonable and that is supported by the record. *Blakeley* v. *Assessors of Boston,* 391 Mass. 473, 477 (1984). In some cases, however, the Legislature has provided that the board should perform a more traditional appellate function, rather than make a de novo determination of value. In such cases, the board's inquiry is limited, at least initially, to determining whether the valuation of the Commissioner was proper. For example, G. L. c. 59, § 39, as amended through St. 1981, c. 111, § 2, which deals with the valuation of the poles, wires, pipes, and the machinery belonging to telephone and telegraph companies, provides that in an appeal from the Commissioner's determination of value for that property, "the appellant shall have the burden of proving that the value of the [property] is substantially higher or substantially lower," than the Commissioner's determination. Only if the taxpayer has met that burden does the board undertake an independent valuation of the property.

General Laws c. 58, § 14, provides that in an appeal from the Commissioner's determination of value under G. L. c. 58, § 13, the board shall "make a finding whether the commissioner acted in accordance with section thirteen. If the board finds that the commissioner failed so to act, it shall thereupon make a determination of value in accordance with section thirteen . . . and its decision shall be conclusive." The necessary implication of the statute is that, if the board finds that the Commissioner acted in accordance with § 13, the board's inquiry is at an end. Only if the board concludes that the Commissioner failed to comply with § 13 should it make an independent determination of value, and then only in accordance with § 13.

To determine whether the Commissioner complied with § 13, we must begin with an analysis of the purpose of that statute. The statutory scheme established by G. L. c. 58, §§ 13-17, was not designed to provide reimbursement to the towns

in the precise amount of taxes lost. While § 13 directs the Commissioner to determine the "fair cash value" of all eligible State owned lands in the Commonwealth, it also provides that such determination "shall be in such detail as to lots, subdivisions or acreage as the Commissioner may deem necessary." We have previously noted that "full and fair cash values can only be approximated." *Macioci* v. *Commissioner of Revenue*, 386 Mass. 752, 761 (1982). See *Sudbury* v. *Commissioner of Corps. & Taxation*, 366 Mass. 558, 560-562 (1974). Revaluation occurs every five years, and the rate of compensation is keyed to the Statewide average tax rate rather than to any local tax rate. See G. L. c. 58, § 17; G. L. c. 63, § 58. In addition, the Commissioner asserts, and the assessors do not dispute, that since 1980 the Legislature has failed to appropriate sufficient funds to reimburse towns at the statutory rate. Instead, the town receives a sum which bears the same ratio to the total appropriation as the value of State owned lands in the town bears to the total value of State owned lands in the Commonwealth. Thus, the statute provides towns with only an approximate reimbursement of lost taxes, and the proportion of the value of all State owned lands located in the town is more important than the absolute value of the land in determining the amount received. In light of the statute's objective, it would be illogical to conclude that the Legislature intended the board to make a de novo determination of land values on appeal, without regard for the method of valuation used by the Commissioner throughout the State. Such a scheme would raise the "spectre of different assessment values in different communities," *Macioci* v. *Commissioner of Revenue, supra* at 763, would be unfair, and, we believe, would be contrary to the Legislature's intent.

In this case the board specifically found that the Commissioner failed to comply with § 13 in valuing State owned lands in Sandwich. It based that conclusion on a number of subsidiary findings, including a finding that the Commissioner's expert had not personally viewed the parcels but instead relied on "hearsay information." The board also observed that the assessor's expert was more persuasive as to land values than the

Commissioner's expert. We note initially that § 13 authorizes the Commissioner to obtain "oral or written information from any officer or agent of the commonwealth or of any county or town therein, and from any other inhabitant thereof." This provision reflects a recognition by the Legislature of the impracticability of requiring the Commissioner to conduct his inquiry in the same detail or with as much personal involvement as reflected in the assessors' expert's study. In light of the express authorization provided by the statute, no negative inference can properly be drawn from the fact that the Commissioner relied to a large degree on information contained in forms submitted by the towns.

To the extent that the board's conclusion that the Commissioner failed to comply with § 13 was based on a weighing of the conflicting testimony of the witnesses and a rejection of the Commissioner's method of valuation in favor of a method it found more persuasive, the board misconstrued its role. In determining whether the Commissioner complied with the statute, the board's task is not to substitute its own judgment as to the most appropriate method of valuation. Rather, it should determine whether the method used by the Commissioner is reasonably designed to achieve the statute's objectives, and whether that method was properly implemented in the particular case. We have previously noted that in the context of a Statewide valuation program, in light of the limited resources of the Commissioner, it may be necessary to "conced[e] perfection in result, in favor of a process which is orderly, expeditious, and reliable." *Newton* v. *Commissioner of Revenue*, 384 Mass. 115, 122 (1981). Thus, the board should determine whether the Commissioner has adopted a procedure which (1) can be applied equally to each town where there are eligible State owned lands and (2) will produce values reasonably approximate to fair cash value. See *id.* at 121. If the procedure adopted by the Commissioner is not arbitrary or capricious, it should be upheld. *Id.* at 122.

If the board determines that the method of valuation employed by the Commissioner throughout the State complies with § 13, it should then determine whether the Commissioner

complied with that method in the particular town. See *Macioci* v. *Commissioner of Revenue, supra* at 763. In this case, the board found that the Commissioner had not followed his own procedures in valuing State owned lands in Sandwich. Although the Commissioner disputes that finding, and the board did not elaborate, a review of the transcript shows that there was some evidence that the Commissioner may not have considered the industrial base in the town, contrary to the procedure described earlier by the Commissioner's expert. In addition, it appears that the Commissioner's figures were inaccurate as to the size of several of the parcels being valued. The question arises whether, given such findings, the board would be warranted in making a de novo determination of land value. Considering the objectives of the statute, discussed above, we do not think that the Legislature intended that result. Because the reimbursement program is not adequately funded, an increase in the valuation of one town adversely affects the amount of compensation all other towns will receive. When the Commissioner has undertaken a valuation of all State owned lands by a method reasonably designed to approximate fair cash values, it would be unfair to employ a completely different method of valuation in only one or two towns. Therefore, where corrections are necessary in the Commissioner's determination of value, but where the method of valuation complies with the requirements of § 13, the board should correct the valuation in accordance with the method used by the Commissioner.

Finally, we address the appropriateness of the Commissioner's exclusion of internal roads from his determination of value. The Commissioner argues that such roads are "improvements" which should not be considered under G. L. c. 58, § 13. We agree. In *Assessors of Amherst* v. *State Tax Comm'n*, 357 Mass. 505, 507 (1970), we held that the word "land" in § 13 was to be given its "common and approved" meaning in valuation contexts, which included improvements made to it. The Legislature then amended § 13 to include the following definition: "As used in this section, 'land' shall not include buildings, structures, improvements or other things erected thereon or affixed thereto." G. L. c. 58, § 13, as appearing

in St. 1974, c. 492, § 6. By amending the statute, the Legislature evidenced an intent to compensate towns for their lost tax revenues measured solely by the value of the original, unimproved land. Under the statutory scheme so established, the amount of reimbursement a town receives does not depend on the use that the State chooses to make of the property. A town in which land is held in its unimproved state for conservation purposes is compensated to the same extent as a town in which the State chooses to locate public buildings and institutions. Where the State increases the value of State owned lands by constructing roads through them, we conclude that the Legislature did not intend to compensate a town for the increase in value represented by the roads themselves or by the frontage on those roads.

The decision of the Appellate Tax Board modifying the Commissioner's determination of value is reversed. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*